Blatchford, J.
The first warrant issued against Farez is, in my judgment, void, because it does not show on its face that the commissioner issuing it is authorized by a court of the United States to issue such warrant. The proceeding is a special proceeding instituted under the convention and the act of August 12, 1848 ; and the fact that the commissioner who issues the warrant is within the said act, a commissioner authorized so to do by a court of the United States, is a jurisdictional fact, and should be set forth on the face of the warrant.
It is the law of this circuit that the judiciary possess no jurisdiction to entertain proceedings under any treaty or convention between the United States and a foreign government, for the apprehension and committal of any alleged fugitive from justice, whose extradition is demanded by such foreign government-, without a previous requisition having been made, under the authority of the foreign government, upon the government of the United States, and the authority of the latter government obtained to apprehend such fugitive (Exp. Kaine, 3 blatchf., 1; Matter of Heinrich, 5 Id., 414, 425). In the latter case it is said : “It would seem indisjoensable that a demand for the arrest of the fugitive should be first made by the executive authorities of the government, and a mandate of the President be obtained, before the judiciary is called upon to act.”
As the proceeding is a special proceeding, I think it is necessary, not only that the complaint made to the commissioner, upon which the warrant is asked, should show that such requisition has been made upon the government of the United States, and such authority ob- *91 tamed from it, but that those facts should also be set forth on the face of the warrant.
As the first warrant contains no such allegation, it is not valid.
The mandate recited in the second warrant and in the complaint upon which the second warrant issued, as the authority from the government of the United States for the arrest of Farez, upon the application therefor, made to it by the Swiss Confederation, is a sufficient mandate. The objection taken is, that the mandate is stated, in the complaint and the warrant, to have been issued by the government of the United States under the hand of the Secretary of State and the seal of the Department of State, and not under the hand of the President and the great seal of the United Stated.
The executive authority of the United States, particularly in its intercourse with foreign powers, and in matters which concern foreign relations, acts through the medium of the Secretary of State and the seal of that department; and the allegation, in the complaint and the warrant, that the government of the United States issued the mandate under the hand of the Secretary of State and the seal of the Department of State, is a sufficient allegation that the mandate was issued by the executive authority. The point taken in the case of Exp. Kaine was, that the proceedings for the apprehension of the fugitive could not be initiated by the judicial department of the government, or by any department of the government except the executive. A mandate issued by the government under the hand of the Secretary of State and the seal of the Department of State, is issued by the executive department of the' government. The practice of the Executive Department to act through the Department of State, in performing executive acts of the character of that in question, has been recognized throughout the history of the government, from the earliest time. The fifteenth article of the convention in question provides that the surrender of a fugitive on the part of the United States shall be made only by the authority *92 of the executive thereof; and yet the act of August 12, 1848, provides that if the magistrate who issues the warrant deems the evidence, which he takes under it, sufficient to sustain the charge under the provisions of the proper convention, it shall he his duty to certify the same to the Secretary of State, that a warrant may issue ; and the third section of the same act provides that it shall be lawful for the Secretary of State, under his hand and seal of office, to order the fugitive to be delivered to the person authorized by the foreign govern ment to receive him. This clearly shows the understanding of Congress that the executive department, in carrying out treaty stipulations between this government and foreign governments, for the apprehension and delivery up of alleged criminals, is to act through the instrumentality of the Department of State; and if the final order for extradition upon which the party is to be taken out of the United States into territories of the foreign government, can be made by the executive authority of the United States through the instrumentality of the Department of State, a fortiori, a preliminary mandate for the arrest of the party can be made by the executive authority of the United States through the medium of the same department.
The writ of habeas corpus having been issued on November 6, commanding the marshal to produce the body of Farez on November 10, at eleven o’clock, A. m., Farez must be considered as being, under said writ, in the custody of the court, at least from the time the writ was served on the marshal; and the marshal had no right, after that time, during the pendency of the writ, to arrest Farez upon any new warrant, or upon any warrant not in his hands at the time the writ was served upon him.
The return by the marshal at the day and hour specified in the writ as the time for the return thereof, states that he arrested Farez, on November 10, under the warrant dated November 9. It appears in evidence that the writ was served on the marshal prior to the time when *93 he arrested Farez under the warrant of November 9. Such arrest on the second warrant was, therefore, illegal. Farez was entitled to have the question determined as to the lawfulness of his imprisonment and detention by virtue of the process 'on which he was claimed to be held at the time the writ of habeas corpus was served on the marshal. The proceedings under the writ had relation to at least as early a period as that. When the question of the lawfulness of the detention under the first warrant should have been disposed of, then the marshal could properly proceed to execute the second warrant, but not before.
The complaint upon which the second warrant was issued is defective in its charge of crime against Farez; and the second warrant itself is equally defective in that particular.
It is not enough, in the complaint, merely to charge the party with the crime named in the convention—that is, forgery. The complaint in this case contains nothing more, in effect, than a naked general charge of forgery, without any sufficient specification of time or place, or of the nature of the forgery, or of the forged instrument or document. It merely alleges that Farez, in the year 1869, or after the twenty-fifth of November, 1850, with the intent to obtain gain for himself, and to cheat and defraud the Swiss Confederation, and some person unknown, committed, within the jurisdiction of the Swiss Confederation, the crimes of forgery, the emission of forged commercial paper, and the utterance thereof, to the amount of thirty thousand francs, or thereabouts. This is, under any system of criminal jurisprudence, a defective complaint.
In the Matter of Heinrich (5 Blatchf., 424, 426), the court say : “ The complaint upon which a warrant of arrest is asked, should set forth, clear-]y but briefly, the substance of the offense charged, so that the court can see that one or more of the particular crimes enumerated in the treaty is alleged to have been committed. The complaint need not be drawn with the formal precision *94 and nicety of an indictment for final trial, but should set forth the substantial, material features ’of the offense.”
No sufficient probable cause for arrest is shown by the complaint in this case. The consul of the Swiss Confederation, in the discharge of his duty, makes the charge against Farez in the complaint, but does not pretend that he has any personal knowledge in the premises, and does not specify the particulars of .the crime to an extent sufficient to authorize any warrant of arrest to be issued. No citizen of the United States could be arrested or held upon a complaint so vague and general in its specifications, or rather, so utterly devoid of specification, as the complaint in this case ; and it certainly never could have been intended, by the treaty-making power, that an alleged fugitive should be arrested upon a complaint less specific than such as would be required in the case of an offense committed in the United States. The act of 1848, in saying that the magistrates named in it are vested with power, upon complaint made under oath or affirmation, charging a person with having committed within the jurisdiction of a foreign government, a crime provided for by a treaty for extradition, to issue a warrant for the apprehension of such person, intends that the warrant should be issued upon such complaint under oath as is generally recognized, in criminal law, as a proper and adequate complaint.
The convention with the Swiss Confederation, in saying, in the thirteenth article, that the delivery up to justice of persons charged with the crimes enumerated in the fourteenth article, shall be done only when the fact of the commission of the crime shall be so established as to justify their apprehension and commitment for trial if the crime had been committed in the country where the persons so accused shall be found, intends to say, not only that the person arrested in the United States shall not be delivered up except on such evidence as would authorize his commitment for trial in the United States, if the crime charged had been committed in the United *95 States, but also that he shall not be apprehended or arrested except on such prima facie evidence as would justify his apprehension and arrest, if the crime charged had been committed in the United States.
It never was intended that it should be sufficient, in order to authorize the arrest of a fugitive from justice, to state merely that the representative of the foreign government charges the party with having committed the crime named in the treaty.
I must, therefore, hold the second warrant, and the complaint on which it was issued, insufficient, in their specifications of the crime charged, to justify the holding of Farez under the second warrant. The warrant of arrest named in the complaint as having been issued against Farez in the jurisdiction of the Swiss Confederation, was the only document presented to the commissioner in support of the complaint made to him, and is, for the purposes of this case, considered as a part of such complaint. Such warrant commands the arrest of Farez, as being accused of ft audulent bankruptcy, and of “plusieurs faux en ecriture cle commerce.'1'1 It is'defective in not specifying the time and place of the commission of the alleged offenses, and the character of the forgeries, or of the instrument or documents in respect of which the forgeries were committed ; and therefore the complaint can derive no support from such document.
Whether the offense of Ufaux en ecriture de commercef* charged in such foreign warrant, is a crime embraced within article XIY. of the convention, is a question not necessary to be considered in this case. It results, therefore, that Farez must be discharged from custody upon both of the warrants named in the return of the marshal.
Note.—The following summary of the treaties and leading authorities on the subject of extradition may be useful to the practitioner.
The extradition treaties of the United States generally require each nation, on requisition made by the supreme authority of any other nation in the manner prescribed by the treaty to deliver up to justice all *96 persons who, being charged with certain crimes specified in the treaty, shall seek asylum or shall be found within the territory of the other.

What Crimes are the subject of Extradition.

The following is an alphabetic table of the crimes which are the subjects of extradition by the existing treaties of the United States.
Arson. Treaty of the United States with Great Britain, 8 U. S. Stat. at L., 576; France, 8 Id., 582; Prussia, 10 Id., 98; North German Confederation, 15 Id., 117; Austria, 11 Id., 692; Italy, 15 Id., 130; Sweden and Norway, 12 Id., 1126; Bavaria, 10 Id., 175; Baden, 11 Id., 714; Two Sicilies, Id., 653 ; Hayti, 13 Id., 728; Venezuela, 12 Id., 1158; Mexico, Id. 1200; Dominican Republic, 15 Id., 183; Hawaiian Islands, 9 Id., 981.
Burglary. Treaty with France, 8 U. S. Stat. at L., 617; Sweden and Norway, 12 Id., 1126. In the treaty between the United States and Mexico, December 11, 1861 (12 U. S. Stat, at L., 1200),. burglary is defined, for the purposes of the treaty, to be “ the breaking and entering into the house of another with intent to commit felony.” And in the convention between the United States and Italy, March 23, 1808 (15 U. S. Stat, at L., 130), it is defined as such breaking and entering by night.
— and the corresponding crimes included, under the French law, in the words “ vol qualifier Convention between United States and ICing of France, February 24, 1845, 8 U. S. Stat. at L., 617. ’
“ Counterfeiting money." Treaty with Venezuela, 12 U. S. Stat. at L., 1158; Dominican Republic, 15 Id., 183; Hayti, 13 Id., 728. “ Making and uttering false money.” Two Sicilies, 11 Id., 653. “ Fabrication or circulation of counterfeit money, whether coin or paper money.” Prussia, 10 Id., 98; extended to the North German Confederation, 15 Id., 117; Treaty with Austria, 11 Id., 692; Bavaria, 10 Id., 175; Baden, 11 Id., 714; Sweden and Norway, 12 Id., 1126. —“Of public bonds, bank notes, and obligations, and in general any title and instrument of credit whatsoever, the counterfeiting seals, dies, stamps, and marks of State and public administration, and the uttering thereof.” Treaty with Italy, 15 Id., 130.
“Embezzlement of public moneys." Treaty with Prussia, 10 U. S. Stat. at L., 98; extended to North German Confederation, 15 Id., 117; Treaty with Austria, 11 Id., 692; Bavaria, 10 Id., 175; Baden. 11 Id., 714; Mexico, 12 Id., 1200. “ Embezzlement by public officers, when the same is punishable with infamous punishment.” Treaty with France, 8 Id., 582 “ Embezzlement by public officers, including appropriation of public funds.” Treaty with Sweden and Norway, 12 Id., 1126; Two Sicilies, 11 Id., 653. “ Embezzlement by public officers, or by persons hired or salaried, to the detriment of their employers.” Treaty with Swiss Confederation, 11 Id., 594; Venezuela, 12 Id., 1158; Dominican Republic, 15 Id., 183 ; Hayti, 13 Id, 728. And the same provision was added to the treaty with France, by an additional article, 11 Id., 741. Embezzle *97 ment of public moneys committed within the jurisdiction of either party by public officers or depositaries; embezzlement by any person hired or salaried to the detriment of their employers.” Treaty with Italy, 15 Id., 130. (In an extradition treaty, the terms “ public officers " and “ public depositaries ” do not comprehend officers of a railroad company, but only signify officers'or depositaries of the government, in some of its branches or degrees. 8 Op. U. S. Att.-Gen., 106.)
Forgery. Treaty with Great Britain, 8 U. S. Stat. at L., 576; France, Id., 582; Prussia, 10 Id., 98; extended to North German Confederation, 15 Id., 117; Austria, 11 Id., 692; Bavaria, 10 Id., 175; Baden, 11 Id., 714, Swiss Confederation, 11 Id., 594; Venezuela, 12 Id., 1158, Dominican Republic, 15 Id., 183; Hayti, 13 Id., 728. In the treaty with Mexico (12 Id., 1200) is added, “ including the forging or making or knowingly passing or putting into circulation counterfeit coin or bank notes or other paper current as money, with intent to defraud any person or persons.” And the same provision was added to the treaty with France by an additional article (11 Id., 471). In the treaty with the Two Sicilies (11 Id., 653), is added,—“including forging of evidences of public debt, bank bills and bills of exchange.” In the treaty with Italy (15 Id., 130), forgery is defined, for the purposes of the treaty, as the utterance of forged papers, the counterfeiting of public, sovereign or government acts. The emission of forged papers is also specified by the following; Treaty with Great Britain, 8 Id., 576; Prussia, 10 Id., 98; extended to the North German Confederation, 15 Id., 117; Bavaria, 10 Id., 175; Swiss Confederation, It Id., 594; Hayti, 13 Id., 728. (It is forgery in France, within "the provisions of the extradition treaty, for a royal notary to insert in an authentic-deed false statements as matter of fact. Matter of Metzger, 5 N. Y. Leg-Obs., 83.) (Proof of the forging of checks on the communal chest of Breslau, in Prussia, is sufficient cause for the issue of a warrant for judicial inquiry, with a view to the extradition of the criminal under the treaty between the United States and Prussia. 6 Op. U. S. Att.-Gen., 761.)' (By the laws of the State of New York, “ every person who, with intent to. defraud, shall make any false entry, &c., in any book of accounts kept by any moneyed corporation in this State, &c., shall, upon conviction, be adjudged guilty of forgery in the third degree.”—Held, that a person offending against this statute was not guilty of forgery, within the meaning of the extradition treaty between the United States and Great Britain nor of the act passed to give it effect, and could not, therefore, be surrendered on requisition. Re Windsor, 11 Jur. N. S., 807).
Frauds by persons holding positions of trust. (Extradition cannot be demanded of France by the United States, in the case of a fraudulent breach of trust by private persons, notwithstanding such offense is made grand larceny by the statutes of the State where committed. The terms of the treaty, bearing on the subject, apply only to embezzlement by public depositaries. 7 Op. U. S. Att.-Gen., 643.)
*98 Kidnapping, defining the same to be the taking and carrying away of free persons by force or deception. Treaty of United States with Mexico, 12 U. S. Stat. at L., 1200.
Larceny. (Larceny is not among the cases provided for by any convention between the United States and Great Britain for the extradition of criminals. Neither is constructive larcen3r, or embezzlement by private persons. 6 Op. U. S. Att.-Gen., 85, 431.) Larceny of cattle or other goods and chattels of the value of twenty-five dollars or more, when the same is committed within the frontier States or territories of either nation. Treaty of United States and Mexico, 12 U. S. Stat. at L., 1200.
Maiming (see Mutilation).
Murder. Treaty of United States and Great Britain, 8 U. S. Stat. at L., 576. (Under this treaty a person charged with murder on the high seas on board a British vessel, must be given up when demanded by Great Britain. For murder on the high seas on board a British vessel is not .committed within the jurisdiction of the United States, although the ves■sel comes into a port of the United States, but is committed within the •exclusive jurisdiction of Great Britain. Whether evidence of justification of the killing can be received in the proceeding,— Query ? lie Bennett, 11 Law Times Rep., 488.) “ Murder, comprehending the crimes designated by the French penal code by the terms, “ d’assinat, de parricide, ■ d'infanticide et d'empoisonment.' ” Treaty of the United States with France, 8 U. S. Stat. at L., 582; Prussia, 10 Id., 98; extended to North German Confederation, 15 Id., 117; Austria, 11 Id., 692; Italy, 15 Id., 130; Bavaria, 10 Id., 175; Baden, 11 Id., 714; Swiss Confederation, Id., 1194; Sweden and Norway, 12 Id., 1126; Two Sicilies, 11 Id., 653; Mexico, 12 Id., 1200; Venezuela, Id., 1158; Dominican Republic, 15 Id., 183 ; Hayti, 13 Id., 728. Attempt to commit murder is included in all the -preceding treaties except the treaty between the United States and Mexico, 12 Id., 1200.
Mutilation. Treaty of United States and Mexico, 12 Id., 1200.
Mutiny. “Mutiny on board a ship, whenever the crew or a part thereof by fraud or violence against the commander, have taken posses•sion of the vessel." Treaty of United States with Italy, 15 U. S. Stat. at L., 130; Sweden and Norway, 12 Id., 1126.
Piracy. Treaty of United States with Great Britain, 8 U. S. Stat. at L., 576; Prussia, 10 Id., 98; extended to North German Confederation, 15 Id., 117; Austria, 11 Id., 692; Italy, 15 Id., 130; Bavaria, 10 Id., 175; Baden, 11 Id., 714; Swiss Confederation, Id., 594; Sweden and Norway, 12 Id., 1126; Two Sicilies, 11 Id., 653; Mexico, 12 Id., 1200; Venezuela, 12 Id., 1158; Hayti, 13 Id., 728. (It was held by Crompton, Blackburn and Slee, JJ., that piracy, -in the treaty of the United States and Great Britain [8 Id., 576], must not be understood in the sense of piracy by the 'law.of.nations, but of acts made piracy by the municipal law of the United States. Re Tirnan, 5 Best & Smith Q. B., 645.) (Lewis, m his pamphlet *99 on Foreign Jurisdiction and the Extradition of Criminals [p. 39], states his opinion as to the meaning of “ piracy ” in conformity with the decisions of the majority of the court in Tirnan’s case. Reporter’s note In re Tirnan, 5 Best & Smith Q. B., 696.) (In time of peace any act of depredation upon a ship is prima facie an act of piracy; but in time of war between two countries the presumption is that depredation by one of them on the ship of the other is an act of legitimate warfare. It is immaterial whether the act was done by soldiers or volunteers, or whether it was commanded by the belligerent state, or when done ratified by it. Re Tirnan, 5 Best & Smith Q. B., 645.)
Rape. Treaty of United States with France) 8 U. S. Stat. at L., 582 ; Italy, 15 Id., 130; Swiss Confederation, 11 Id., 694; Sweden and Norway, 12 Id., 1126; Two Sicilies, 11 Id., 653 ; Mexico, 12 Id., 1200; Venezuela, Id., 1158; Dominican Republic, 15 Id., 183; Hayti, 13 Id., 728.
RoVbery. ' Treaty of United States with Great Britain, 8 U. S. Stat. at L., 576; France, Id., 617; Prussia, 10 Id., 98; extended to the North German Confederation, 15 Id., 117; with Austria, 11 Id., 692; Bavaria, 10 Id., 175; Baden, 11 Id., 714; Sweden and Norway, 12 Id., 1126; Hayti, 13 Id., 728; Hawaiian Islands, 9 Id., 182.
Other treaties define or restrict the term as follows: “ Robbery, defining the same to be the felonious and forcible talcing from the person of another goods or money to any value, by violence or putting him in fear.” Treaty of United States with Italy, 15 Id., 130; Mexico, 12 Id., 1200. “ Robbery with violence, intimidation, or forcible entry of an inhabited house.” Treaty of the United States with the Swiss Confederation, 11 Id., 594; Two Sicilies, Id., 653; Dominican Republic, 15 Id., 183. The treaty of the United States with Venezuela (12 Id., 1158) contains the same provisions, except that it refers to private houses, and is not restricted to inhabited houses. The treaty of the United States with the king of France adds: and the corresponding crimes included under the French law in the words 1 vol qualifie.’ ”

Exceptions to the foregoing cases.

The following treaties contain a general restriction of the enumerated crimes, to cases where the crimes mentioned are subject to infamous punishment. Treaty of United States with Italy, 15 Id., 130; Swiss Confederation, 11 Id., 594 ; Venezuela, 12 Id., 1158; Dominican Republic, 15 Id., 183. The treaties do not, in general, apply to crimes or offenses of a purely political character, nor to desertions from military or naval service, nor to offenses committed before the treaty under which extradition is sought took effect. Some of the treaties, also, except the citizens and subjects of the nation on whom the demand is made.
“ Fleeing from justice’’ not material.
The language oí some of the treaties is “ persons who seek an asylum or *100 are found," but it is obviously the latter circumstance alone which controls. It is not sufficient to show that the accused sought an asylum if he was not found within the territorial jurisdiction, and if he is so found it is not necessary to show that he was seeking an asylum.
An alleged criminal is subject to extradition, notwithstanding that he may have come to this country otherwise than as an apparent fugitive on account of the particular crime; for the treaties apply, not only to persons seeking an asylum here professedly, but to such as may be found in the country also. 8 Op. U. S. Att.-Gen., 306.
The treaty between the United States and the Two Sicilies (October 1, 1855, 11 Slat, at L., 553) expressly extends.to the case of one seeking asylum on board the vessels of war of the nation on whom the demand is made.

Place of commission of offense

It has been said that to justify the commencement of process in extradition, it must appear that the acts charged were committed within the territorial jurisdiction of the demanding government. 1 Op. U. S. Att.-Gen., 83; 8 Id., 215. But in the construction of the British treaty of extradition, a crime committed at. sea, on board of an American vessel, has been considered the same as if committed in the territory of the United States. And it has been considered under the French treaty that where a crime is committed at sea, it is committed within the putative territory of the Union, and is justiciable by the federal judiciary alone, and is therefore rightfully a case of extradition. Lawrence's Wheaton, 242, note. See, also, Re Bennett, 11 Law Times Rep., 488.

The demand by the foreign government

All demands: for international extradition must emanate from the supreme political authority of the demanding State. 7 Op. U. S. Att.-Gen., 6. There can be no actual extradition until a proper requisition to that effect has been made by the foreign government to the Secretary of State. Extradition cannot be made upon mere judicial documents, for they are not requisitions, but only proof upon which the Secretary of State is to act when due requisition shall have been made. 8 Op. U. S. Att.-Gen. 240. By the treaty with Mexico, however, extradition in cases of crime on the border may be demanded and granted by certain local authorities.
The United Slates will not make demand upon a foreign nation for extradition of a person alleged to be a fugitive from the justice of one of the United States, and to have taken refuge in such foreign nation, except on the exhibition of a judicial “warrant," duly issued on sufficient proof, by the local authority of the State in which the crime is alleged. 6 Op. U. S. Att.-Gen., 485.

Necessity of executive authority to make arrest.

The rule laid down on this point, in the case in our text, is in accord *101 anee with the case of Henrich under the Prussian treaty. 5 Blatchf. C. Ct., 414. The- substance of the decision in that case is also given in 2 Abb. Nat. Dig., 509, 511, 512; S. C., 10 Cox Crim. Cas., 626.
In this respect, however, it is to be observed that the extradition treaties of the United States are of two classes.
The language of the Treaty with Austria, July 3, 1856 (11 U. S. Stat. at L., 692), seems to contemplate an, arrest by judicial authority in the first instance, upon a complaint made under oath, and that the judicial decision, if against the accused, shall be certified to the executive authorities, in order that a warrant for surrender may issue. And of the same character are the provisions in the Treaty between the United States and Great Britain, August 9, 1842 (8 U. S. Stat. at L., 576); Convention between United States and Prussia, June 16, 1852 (10 Id., 98); extended to North German Confederation by Treaty of February 22, 1868 (15 Id., 117); Treaty between United States and Bavaria, September 12, 1853 (10 Id., 175); Convention between' United States and, Baden, January 30, 1857 (11 Id., 714).
On the other hand, the most recent of the treaties (Convention between the United States and Italy, March 23, 1868, 15 U. S. Stat. at L., 130), requires a copy of the foreign warrant and of the depositions upon which it was granted, to be forwarded in the first instance to the executive, and authorizes the executive then to issue a warrant for the arrest of the accused, and his examination before the proper judicial authority.
The American practice is thus stated in the Opinions of the U. S. Attorneys- General:
“ The mode to be pursued in proceedings for the extradition of criminals is, to prefer a complaint to a judge or other magistrate, setting out the offense charged to have been committed, on oath, whereupon the judge or magistrate is authorized to issue a warrant for the apprehension of the person accused, and, upon his being brought before them, to hear and determine the evidence of his criminality; and if, on such a hearing, the evidence be deemed sufficient to sustain the charge, to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive." 4 Op. U. S. Att.-Gen., 201. To similar effect, 9 Id., 379.
But, if requested, the President will issue the previous authorization thought to be necessary by a portion of the court, in Re Kaine (14 How. U. S., 103). 6 Op. U. S. Att.-Gen., 91.
The case in our text settles the practice, for the second circuit, at least, of requiring the executive authority in the first instance.
Clarke, in his Treatise on Extradition (pp. 96, 98), states the practice under the treaties between Great Britain and France as follows:—
“Demands by Great Britain upon France are always made by the ambassador m Paris, m the name of the English government, directly upon the French government, and are supported by a warrant of arrest issued oy a magistrate m England, and copies of the depositions oo which it was *102 founded. These last, however, are not necessary, the French authorities being contented to deliver up the fugitive upon the production of the warrant of arrest only. The papers are always taken to France by a police officer able to speak to the identity of the accused. Upon this the demand is considered by the French government, and, if it is granted, the fugitive is arrested and given up without any investigation by a French court. The matter is purely one of state, with which no legal tribunal-is competent to deal.
“ A demand in extradition upon England must be made upon one of the principal secretaries of state, the chief secretary of the lord lieutenant of Ireland, or the governor of any foreign colony or possession of her majesty, by the ambassador or other diplomatic agent of the foreign government.
“The demand need not he accompanied by any copies of depositions, or even of a warrant of arrest issued in the foreign country; but it is usual for the secretary of state to require some prima facie evidence of guilt to be laid before him. If, on consideration, he thinks the surrender should be granted, he issues his warrant, signifying that this requisition has been made, and requiring all magistrates to govern themselves accordingly, and to aid in apprehending the fugitive and committing him to prison, to be delivered up pursuant to the treaty. The warrant is then taken before a magistrate, who, on the production of the foreign warrant of arrest, and also of some evidence that the accused has committed an offense within the treaty, issues his-warrant of arrest.’’

Executive authority, how obtained.

A mandat d'arret issued upon suitable evidence by the proper judicial authority of -France, and setting forth the crime imputed to the accused, is sufficient to justify the preliminary action of the President for the arrest of the fugitive, leaving the ulterior question of his actual extradition to depend on the full evidence of criminality then, as it should appear from the despatch of the Minister of Foreign Affairs, on its way from France. Lawbexce’s Wheaton, 242, note.
The President, in granting his mandate, at the request of a foreign government, for the purpose of commencing proceedings in extradition, does not need such' evidence of the criminality of the party accused as would justify an order of extradition, but only prima facie evidence. 6 Op. U. S. Att.-Gen., 217.
The application for surrender, under the treaty of extradition of 1842, between the United Slates and Great Britain, may be made by the British minister, and need not be founded on a previous indictment found against the prisoner by the British tribunals, or on any warrant issuing therefrom. Matter of British Prisoners, I Woodb. & M., 66.
A mere notification, by the heal officer of a foreign government, of the escape of an alleged criminal, is not sufficient prima facie evidence of a case, to justify tne preliminary action of the President. 7 Op. U. S. Att.Gen., 6.

*103
Powers of United States Commissioners.

The power conferred by the act of August 12, 1848, upon the judges of the supreme and district courts, and upon the judges of the several State courts, to entertain complaints under the extradition treaties, is not extended to commissioners of the United States by virtue of their office. The statute confers the power upon the commissioners, to entertain such complaints and issue warrants, when authorized to do so by the courts of th'e United States. And this provision, it is held, contemplates an order of court authorizing the commissioner in question to exercise the power. 1 Abbotts' U. S. Courts Practice, 2G5.

The hearing.

In the United States it is held that the question of remanding the prisoner for further examination, and the time of remanding, and the determination of the magistrate as to whether the crime is proved and the case is within the treaty, are matters of purely judicial determination, not subject to appeal or to executive interference or revision. Matter of Metzger, 5 How. U. S., 176; 6 Op. U. S. Att.-Gen., 91; 10 Id., 501.
The attorneys for the government in the United States are not charged with any duties in reference to the judicial inquiry instituted before ordering an extradition. The minister or agent of the government making the requisition, employs such counsel as he pleases, if any are necessary. 9 Op. U. S. Att.-Gen., 246, 497.
It was held m the Matter of Metzger (5 N. Y. Leg. Obs., 83) that the test of what constituted the cnm.e is the law of the country which demands the fugitive, not that of the nation upen which the demand is made.
In Dana’s Wheaton (§ 117, note) it is said that the extradition acts are restricted to the cases which have the essential and substantial elements of the offenses specified, and according to the law of both countries; and the mere fact that an act, which, according to the general law of either country, has not the character of a particular offense, is treated as such by the law of one of them, does not bring a case within the treaty. We must assume that the terms employed are used in a sense common to both parties to the treaty. But compare Re Windsor (6 Best & S., 522), where it was held that the enumeration of crimes in the treaties refers to such acts as amount to any of those offenses, according to the law of England, and the general law of the United States, and does not comprise offenses which are only such by the local legislation of some particular-state of the American Union ;—and Re Tirnan (5 Id., 696), where “ piracy” was taken as understood according to the law of the United States, rather than the law of nations.

Documentary evidence.

The proper authentication of depositions is regulated by the act ol Congress of August 12, 1848, 9 U. S. Stat. at L., 302, § 29; Act of Con *104 gress of June 22, 1860, 12 Id., § 1, 84. See, also, 10 Op. U. S. Att.-Gen., 501; Matter of Metzger, 5 N. Y. Leg. Obs., 83.
The following rules, in addition to those in the case in our text, have been laid down as to the documentary evidence:
The affidavit which charges the crime is defective if the affiant only swears to his belief. Suspicion does not warrant a commitment, and all legal intendments are to avail the prisoner. The return is to be most Strictly construed in favor of liberty, Exp. Henrich, supra.
The court can regard only the facts set forth in the affidavit as having any legal existence. Any mis-recitals and over-statements in the requisition and warrant, which are not supported by the affidavit, cannot be received as evidence to deprive a citizen of Ms liberty, and transport him to a foreign State for trial. Exp. Smith, 3 McLean, 121.
The affidavit, upon which a warrant of arrest is to issue for the extradition of a fugitive, must state distinctly that the fugitive has committed a crime, and that he committed it in the State from which the requisition comes, for no foreign State can entertain such a jurisdiction of crimes committed in another State, as to entitle it to make requisition for the criminal on a third State. Ib.
Each piece of documentary evidence offered by the agents of the foreign government, in support of the charge of criminality, should be accompanied by a certificate of the principal diplomatic or consular officer of the United States, resident in the foreign country from which the fugitive Vnaffi have escaped, stating clearly that it is properly and legally authenticated, so as to entitle it to be received in evidence in support of the same criminal charge by the tribunals of such foreign country. Exp. Henrich, suprh.
The parties seeking the extradition of the fugitive should be required by the commissioner to furnish an accurate translation of every document offered in evidence which is in a foreign language, accompanied by an affidavit of the translator, made before Mm or some other United States commissioner or judge, that the same is correct. Ib.
Public officers should furnish authenticated copies of documents in their custody when demanded, and should assist in bringing forward testimony according to the duties of their several stations, and individuals should not refuse to give testimony. 1 Op. U. S. Att.-Gen., 82.
The commissioner before whom an alleged fugitive is brought for hearing, should keep a record of all the oral evidence taken before lnm, taken in narrative form and not by question and answer, together with the objections made to the admissibility of any portion of it, or to any part of the documentary evidence, briefly stating the grounds of such objections, but shoiild exclude from the record the arguments and disputes of counsel. Exp. Henrich, supra.
Letters permissive authorizing proceedings of extradition to be instituted m the United States, form in no sense a judicial paper of any sort. They are nothing but a political commission, or executive license to enable *105 the demanding government to go before the courts and proceed to establish a case of extradition m due form of law. Hence, a clerical error in such a document does not affect its validity. 8 Op. U. S. Att.-Gen., 420.
Some of the treaties provide that in case of a criminal already condemned, the sentence, or a copy of it duly authenticated, must be produced.

Sufficiency of proof.

Mere suspicion is no ground for a requisition of a fugitive from a foreign nation. The law of nations requires that evidence—clear and positive evidence—shall be furnished. 1 Op. U. S. Att.-Gen., 509.
The proof should be in all cases, not only competent, but full and satisfactory, .that the offense has been committed by the fugitive in the foreign jurisdiction—sufficiently so to warrant a conviction, in the judgment of the magistrate, of the offense with which he is charged, if sitting upon the final trial and hearing of the case. No magistrate should order a surrender short of such prool. Exp. Kaine, 3 Blatchf. C. Ct., 1.
A letter from the foreign minister resident here, asking for the preliminary process for extradition of an alleged, fugitive criminal, accompanied by a warrant of arrest of the accused, purporting to be issued on due inquiry and evidence, by competent judicial authority in the foreign nation, and sufficiently authenticated by the minister’s certificate, would not, if presented to an examining magistrate in the United States, be alone sufficient to authorize him to certify the criminality of the party charged, on which to found his actual extradition ; for such evidence would not justify his commitment by the local law where the examination takes place. 6 Op. U. S. Att.-Gen., 217.
To authorize the arrest and removal of a fugitive from justice to the State having jurisdiction of the crime, it must distinctly appear from the affidavits before the magistrate, upon which the requisition was based, that the supposed criminal committed the crime in the State from which the requisition proceeds. Exp. Smith, 3 McLean, 121.

The surrender.

A provision that the surrender shall be made only by authority of the proper executive officers of the nation upon whom the demand is made, is usual m the American treaties.
By the British and American systems of extradition, the judicial inquiry and determination of the fact of culpability is interposed as a condition to the surrender, but the. judicial magistrate is not vested with power to make the surrender. Dana’s Wheaton, § 116, note 73.
The question whether the casus foederis has arisen, or whether the compact will be executed, is a political question to be decided by the President, and the courts have no power to direct or contravene his decision. Matter of Metzger, 5 N. Y. Leg. Obs., 83.
According to the opinions expressed in Dana’s Wheaton (§ 117, note), *106 and by Clarke in his Treatise on Extradition (p. 110), a nation upon whom a demand for extradition is made, may protect its right to give asylum, by looking behind the mere formal proofs of a crime committed by the person demanded, to see that the real object is not to get possession of him for a purpose to which the treaty does not apply.
Clarice (p. 110) lays down the rule that no surrender should be granted except on the declaration of the minister of the foreign power that the fugitive is wanted for trial for the offense charged in the depositions used against him, and no other.
Bhmtschli (Droit Intern. Codifie, art. 401) says that the State upon which a demand for extradition is made, may impose conditions in reference to the treatment and punishment of the person surrendered.
A recent act of Congress (March 3, 18G9) relates to the enforcement of and resistance to process in extradition.

Second arrest.

The discharge of a person arrested under the provisions of this chapter does not, in general, preclude a second arrest under a new complaint relating to the same crime or offense. 6 Op. U. S. Att.-Gen., 91; 10 Id., 501.